IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DWDUBBELL ARKANSAS, LLC PLAINTIFF/COUNTER-DEFENDANT

V. CASE NO. 5:20-CV-05103

JAKE M. BUSHEY DEFENDANT/COUNTER-PLAINTIFF

V.

DAVID W. DUBBELL COUNTER-DEFENDANT

## MEMORANDUM OPINION AND ORDER

This action arises out of a contract dispute between Plaintiff/Counter-Defendant DWDubbell Arkansas, LLC ("DWD") and Defendant/Counter-Plaintiff Jake M. Bushey. Bushey also filed a claim against David Dubbell ("Dubbell"), President and CEO of DWD. Pending before the Court are DWD and Dubbell's Motion for Summary Judgment, Brief in Support, and Statement of Undisputed Facts (Docs. 36, 37, 38); Bushey's Response in Opposition and Response to the Statement of Undisputed Facts (Doc. 39, 40, 41); and DWD and Dubbell's Reply (Doc. 42). After considering each document and accompanying attachments, and for the reasons set forth below, the Court **DENIES** the Motion for Summary Judgment (Doc. 36).

## I. BACKGROUND

This case ultimately turns on the interpretation of an agreement signed by Dubbell and Bushey in December 2014 (the "Agreement").

Until March 31, 2020, and at all times relevant to this litigation, Dubbell served as President and CEO of Pel-Freez Arkansas, LLC ("Pel-Freez"), an Arkansas limited liability

company. Pel-Freez changed its name to DWDubbell Arkansas, LLC ("DWD") following a sale of certain assets to Mercure Capital, LLC, in March 2020. (Doc. 36-1, p. 2).

Bushey operates an independent CPA firm. In March 2014, Pel-Freez became a client. Between March and June 2014, Bushey helped the company prepare financial statements, dedicating about eight hours per week to Pel-Freez matters at a rate of $60 per hour. (Doc. 40-1, p. 98). During that period, Dubbell and Bushey discussed the possibility of Bushey joining Pel-Freez in a more expansive capacity, and in June 2014, Dubbell hired Bushey as Pel-Freez's Chief Operating Officer ("COO"). The parties agreed Bushey would work about 20 hours a week at a rate of $75 per hour. "[R]unning the company" was Bushey's responsibility going forward. (Doc. 40-1, p. 97).

On September 11, 2014, Dubbell emailed Bushey proposed "long-term compensation" terms, including a "[p]hantom stock option for sharing [in] net value increases in [the] event of a sale or merger." *Id.* at p. 94. Dubbell suggested a 12% equity grant that would vest over three years, contingent on Bushey "reaching minimum short and long term performance targets." *Id.* at pp. 93–95. Bushey rejected Dubbell's proposal. On December 1, 2014, Bushey countered with a new list of compensation demands. Dubbell used Bushey's proposed terms as a basis to draft the Agreement, which both parties ultimately signed on December 8, 2014. It lists the following seven terms:

> A. You continue as an at-will employee with the expectation that you will be on site 3 days per week for a full workday, with reasonable flexibility as to when you put that time in and available by phone and email 24/7 in exchange for a payroll salary of $1,500 per week.
>
> B. You will receive a performance bonus of $12,000 for your . . . first 6 months with Pel-Freez, to be paid on or before 12/31/14.

> C. Presuming you are available as indicated in A above, we agree that you may [use] your remaining time to continue your independent accounting practice.
>
> D. You will receive a quarterly bonus of $6,250 upon the conclusion of each full calendar quarter, payment to be made in the following month.
>
> E. The quarterly bonus will be enhanced if 15% of the company's pre-bonus earnings after pension contributions but before interest, taxes depreciation and amortization exceed[] the $6,250 amount in D above[.]
>
> F. Providing you a benefit upon sale or merger of Pel-Freez equal to 12%, net of all transaction consists, of the appreciation in company value between 6/30/2014 and date of sale, with the value of the company stipulated at 6/30/14 to be zero and that 12% benefit gradually vesting by 2 percentage points each 6 months, starting 12/31/14 and reaching the agreed 12% on 6/30/17.
>
> G. Providing a 5% bonus on the gross sales price from the sale of Pel-Freez to a purchaser referred by you.

(Doc. 2-1, p. 8).

The Agreement also states the parties' intent to prepare a more comprehensive compensation plan at some future date. In relevant part, the introduction and conclusion state:

> [W]e have agreed that a definitive Compensation Plan will be prepared and reviewed in January of each year. This Plan will be needed to define details of your responsibilities and authorities . . . and reaching clarity in regard to the many needed Compensation Plans terms to cover when possible future events, such as your resignation, disability, sudden death, company bankruptcy, etc. This letter's purpose is to define the quantitative details of your compensation.
>
> . . .
>
> The above A-G define our basic agreement for your ongoing compensation, with our both understanding that full definition to reside within the yet to be prepared Compensation Plan.

*Id.*

No second compensation plan ever materialized. Instead, over the next 20 months or so, the parties performed in accordance with the Agreement's terms. Bushey received

a salary of $1,500 per week,[1] a performance bonus of $12,000, and a quarterly bonus of $6,250 with a 15% enhancement. Provisions F and G, both contingent on a future sale of the company, are the only terms not performed during Bushey's employment.

In September 2016, Bushey stepped down as COO, although he remained as Pel-Freez CFO for some period of time to ensure a smooth handoff.[2] On March 31, 2020, Pel-Freez sold certain assets to Mercure. After Bushey learned of the sale, he emailed Dubbell to request payment under Term F of the Agreement, which the parties refer to as the "Sale Benefit Clause." DWD then initiated this litigation to obtain a declaratory judgment that Dubbell and DWD do not owe Bushey any obligation under the Sale Benefit Clause. Bushey answered and lodged counterclaims for breach of contract and promissory estoppel against DWD and Dubbell. DWD and Dubbell now move for summary judgment on their declaratory judgment and Bushey's counterclaims.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." On such a motion, the Court reviews the facts in the light most favorable to the opposing party and gives that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden

---

[1] Dubbell testified in his deposition that, following December 8, 2014, Bushey received a salary of $1,500 per week. (Doc. 40-1, p. 25). But, according to Dubbell, Bushey received a raise at some point. *Id.* To the extent Bushey disputes this assertion—if either party deems the discrepancy material to their position—it is a question of fact for the jury to determine.

[2] The record does not state how long Bushey provided services to Pel-Freez after stepping down as COO.

of proving that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

If the moving party meets its burden, the non-moving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The non-moving party must instead produce sufficient evidence "such that a reasonable jury could return a verdict" in their favor. *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, at 248 (1986)).

## III. DISCUSSION

### A. Bushey's Personal Liability Counterclaim Against Dubbell

DWD and Dubbell's first argument on summary judgment is that any obligation to Bushey under the Sale Benefit Clause should bind only DWD, not Dubbell. In response, Bushey argues that Dubbell signed the Agreement document in his personal capacity—not as a representative for Pel-Freez. Viewing the facts in the light most favorable to Bushey, the Court finds a genuine issue of material fact regarding whether Dubbell assumed individual liability under the Agreement.

DWD and its predecessor, Pel-Freez, are limited liability companies organized under Arkansas law. In general, the manager of an LLC is not liable for a debt, obligation,

or liability of that company, *see* Ark. Code Ann. § 4-32-304, and the manager of an LLC often functions as the LLC's agent, Ark. Code Ann. §§ 4-32-401, 4-32-301. However, DWD and Dubbell fail to explain how such principles clarify the issue at hand: Did Dubbell act solely as an agent for Pel-Freez in executing the Agreement, or did Dubbell assume personal liability?

Under Arkansas law, an agent may be personally bound if the agent so agrees, *see McCullough v. Johnson*, 816 S.W.2d 886, 887 (Ark. 1991), and where "the facts are in dispute, agency is a question of fact to be determined by the finder of fact," *Grayson & Grayson, P.A. v. Couch*, 388 S.W.3d 96, 104 (Ark. Ct. App. 2012) (citation omitted).

There is evidence that Dubbell hired Bushey as COO to turn Pel-Freez around for the purpose of safeguarding Dubbell's personal retirement. For example, in Dubbell's September 11, 2014 email to Bushey, Dubbell proposed that Bushey receive equity if he met certain targets, including that Dubbell and his wife "continue to receive at least current rental income, and [the] Pension Plan continues with Dubbells as full participants." (Doc. 40-1, p. 94). Bushey further testified that he was aware Dubbell had taken a loan against his home and personally guaranteed loans to save Pel-Freez, so Bushey "always tried to get as much cash to him as he was entitled as soon as we could." (Doc. 42-1, p. 4). Bushey also points out that the documents prepared by Dubbell's attorneys to execute the March 2020 asset sale to Mercure describe the Agreement as a "Letter of Intent between Dubbell and Jake Bushey." (Doc. 39-1, p. 92).

For these reasons, the Court will not dismiss Dubbell from this litigation. Summary judgment on Bushey's Counterclaim against Dubbell is **DENIED.**

**B. Bushey's Breach of Contract Counterclaim**

DWD and Dubbell next argue that Bushey's contract counterclaim fails as a matter of law because the Agreement lacks sufficient definiteness to bind the parties. DWD and Dubbell contend that references in the Agreement to a yet-to-be drafted Compensation Plan render it an unenforceable "agreement to agree" and the absence of material terms in the Sale Benefit Clause is similarly fatal.

Contract formation requires: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation. *City of Dardanelle v. City of Russellville*, 277 S.W.3d 562, 565–66 (Ark. 2008). In addition, the contract's material terms must be "reasonably certain." *Id.* at 566. Arkansas courts have long held agreements to agree are "too vague to enforce." *Troutman Oil Co. v. Lone*, 57 S.W.3d 240, 244 (Ark. Ct. App. 2001). Where "the parties have by their words made clear that there is no present intent to be bound, and that they intend to be bound only in the future, and then only if they subsequently reach an agreement with respect to the unsettled terms," no contract is created. § 3:5. Intent to contract, 1 Williston on Contracts § 3:5 (4th ed.).

The Agreement does not constitute an unenforceable "agreement to agree." To the extent a contract is indefinite on its face, the parties' conduct may cure the uncertainty. *See Swafford Ice Cream v. Sealtest Foods*, 483 S.W.2d 202, 204 (Ark. 1972) (finding that even if contract terms are "vague and uncertain . . . this does not necessarily mean that [the] contract is a nullity, as the actions of the parties in carrying out the agreement can provide an index to [its] meaning"). It is undisputed that the parties here agreed that Bushey would take over Pel-Freez's day-to-day management responsibilities in exchange

for certain defined weekly compensation and contingent bonus (and enhanced bonus) compensation. It is likewise undisputed that both Pel-Freez (now DWD) and Bushey performed their mutual obligations under the Agreement—at least until Bushey stepped down as COO in 2016. Thus, the parties' actual course of performance suggests something more than a mere agreement to agree. The fact that Pel-Freeze's performance under the Sale Benefit Clause was contingent upon a (now disputed) future event does not mean (certainly not at summary judgment) that the parties had yet to agree.

DWD and Dubbell next make a similar and related argument that the Sale Benefit Clause is unenforceable because it fails to supply the requisite degree of certainty. They argue the Clause lacks essential details like the type (and timing) of transactions that would be covered and the circumstances under which the provision would expire. Under Arkansas law, "the terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Yancy v. Hunt*, 547 S.W.3d 116, 121 (Ark. Ct. App. 2018). The Sale Benefit Clause articulates a vesting schedule tied to performance metrics and specific dates but does not discuss whether the benefit is premised on Bushey's continued employment through completion of the vesting schedule and/or through the consummation of any future sale. No contract, however, provides for every eventuality, and DWD and Dubbell fail to explain—or cite precedent to support—why mere ambiguities in the Sale Benefit Clause prevent a factfinder from determining whether one party or the other is in breach. The distinction is critical because *ambiguity*—as opposed to vagueness, indefiniteness, or uncertainty—is

not fatal. *See Aon Risk Servs., Inc. v. Meadors*, 267 S.W.3d 603, 610 (Ark. Ct. App. 2007). Ambiguity requires interpretation but does not defeat contract formation.

Here, the scope of the Sale Benefit Clause is ambiguous—not indefinite. A factfinder could consider parol evidence presented at trial to determine the parties' intent, construe the contested clause accordingly, and, ultimately, decide whether a breach occurred. Thus, summary judgment on Bushey's breach of contract counterclaim is **DENIED.**

### C. Bushey's Promissory Estoppel Counterclaim

DWD and Dubbell next argue Bushey's promissory estoppel claim should be dismissed. According to DWD and Dubbell, Bushey clearly asserted a breach of contract claim, so it is improper for Bushey to assert an equitable claim for promissory estoppel. Further, they argue, Bushey fails to prove an essential element of promissory estoppel, *i.e.*, that DWD and Dubbell should have expected their promises to induce certain actions by Bushey.

The Court disagrees with both of these arguments and declines to grant summary judgment. First, it is black letter law that a plaintiff may assert alternative theories of recovery—even contradictory ones—up until the point the court instructs the jury. *See ITT Educ. Servs. Inc. v. AP Consol. Theatres II Ltd. P'ship.*, 195 F. Supp. 3d 1031, 1042 n.6 (E.D. Ark. 2016) ("While a party may not recover for the same loss for both breach of contract and promissory estoppel, the two theories may be pursued in the alternative."). The fact that Bushey has asserted alternative claims is not a proper basis for summary judgment.

Second, a genuine issue of material fact exists as to whether DWD and Dubbell should have expected Bushey to rely on their promises. To prove promissory estoppel, a plaintiff must show that the defendant should have reasonably expected the plaintiff to act or refrain from acting in reliance on the promise. *See Barrows/Thompson, LLC v. HB Ven II, LP*, 599 S.W.3d 637, 648 (Ark. Ct. App. 2020) (citing *Fairpark, LLC v. Healthcare Essentials*, 381 S.W.3d 852 (Ark. Ct. App. 2011)). The record demonstrates that, after negotiating the terms back and forth by which he would serve an expanded role in-house, Bushey served as Pel-Freez's COO for approximately two years. Viewing these facts in the light most favorable to Bushey, a reasonable factfinder could conclude DWD and Dubbell should have expected that Bushey would rely upon the promises made at the end of those negotiations. Accordingly, summary judgment on Bushey's promissory estoppel counterclaim is **DENIED.**

### D. DWD and Dubbell's Claim for Declaratory Judgment

Finally, DWD and Dubbell move for summary judgment on their declaratory judgment claim. The Court declines to grant their motion. For the reasons stated above, the Court believes there are genuine issues of material fact that the jury must resolve in this case, including whether Dubbell intended to assume personal liability for promises made in the Agreement, and whether DWD and Dubbell breached the Sale Benefit Clause. Given these unresolved factual issues, the Court cannot, as a matter of law, grant DWD and Dubbell their sought-after relief. Summary judgment is **DENIED.**

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that DWD and Dubbell's Motion for Summary Judgment (Doc. 36) is **DENIED**.

**IT IS SO ORDERED** on this 24 day of September, 2021.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE